**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| APRIL DAWN NELSON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of the Social Security )<br>Administration, )<br>)<br>Defendant. ) | Case No. 08-cv-627-TLW |

## ORDER AND OPINION

Plaintiff, April Dawn Nelson, pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 216(i), 223(d) and 1382c(a)(3)(A). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge.[1]  [Dkt. # 8].

### Plaintiff's Background

Plaintiff was born on February 8, 1970 and was 38 at the time of the ALJ's final decision. [R. 59-69]. Plaintiff has a twelfth grade education.[2]  [R. 12]. Plaintiff was married to Jesse Nelson from November 8, 1990 and was divorced on January 31, 2001. [R. 69]. Plaintiff then married Dustin Park on December 17, 2001. [R. 69]. Plaintiff was later divorced and is

---

[1]  Plaintiff's protectively filed applications for disability insurance benefits were denied initially and on reconsideration. A hearing before Administrative Law Judge ("ALJ") Lantz McClain was held on January 11, 2008. By decision dated March 21, 2008, the ALJ entered the findings that are subject of this appeal. The Appeals Council denied plaintiff's request for review. The decision of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

[2]  On the initial Disability Report-Adult, plaintiff said she finished twelfth grade, but at the hearing she testified that she only finished the tenth grade. [R. 93, 752].

currently unmarried. [R. 704]. Plaintiff is the mother of three sons, two of which are twins. [R 70]. Plaintiff meets the insured status through March 31, 2008. [R. 12]. Plaintiff has a past work history of unskilled labor that includes work as a cook and a housekeeper at a nursing home (2002-2003), an assembly line worker (2003), and a call center operator (2004). [R. 77, 121]. However, none of her employment qualifies as substantial gainful activity ("SGA").

In plaintiff's initial Disability Report-Adult, dated September 1, 2005, plaintiff alleges she has bi-polar disorder related to stress and seizures which result in vomiting, lack of balance, trouble speaking, bad headaches, and no memory, usually taking her "5-7 days before I am back to myself." [R. 85]. In the plaintiff's Disability Report Appeal, plaintiff reports no change in her condition except that her "medication makes [her] tired" and "[she] gets really depressed where [she] can't get out of bed or sometimes [she is] awake for days. After seizures, [she] can't do anything but rest for a good 7-10 days."[3] [R. 144]. This report indicates plaintiff was taking Lamictal, Lithium, Topamax, and Zoloft for her bi-polar condition and for seizures. [R. 143]. Plaintiff states she uses tobacco but denies any alcohol or drug abuse.[4] [R. 416].

The ALJ did a full five step sequential analysis to determine if plaintiff is disabled. At step one of the five step sequential process, the ALJ determined that plaintiff had not engaged in substantial gainful activity since January 1, 1989, the alleged onset date of her disability. [R. 12]. At step two, the ALJ acknowledged plaintiff's severe impairments to be bi-polar disorder and seizures. [R. 12]. In discussing plaintiff's mental issues, the ALJ noted that plaintiff had a history of treatment. The history of treatment included an examination of the plaintiff's treatment in the Grand Lake Mental Health Center ("GLMHC"), treatment at the Neurological

---

[3] The Court could not determine the date of this document, but it was completed sometime after March 13, 2006.

[4] Review of the record shows the plaintiff's family has acknowledged her drug use, and the plaintiff tested positive for THC in 2003. [R. 215, 276].

Center of Oklahoma, treatment with a psychiatrist, Dr. Schechter, and the plaintiff's GAF scores (one on March 31, 2001, which was estimated at 50, and another on August 14, 2006, which was estimated at 70). [R 15-17].

At step three, the ALJ determined plaintiff's impairments did not meet any listing in the Listing of Impairments. [R. 12]. Specifically, the ALJ looked at listing 12.04, affective disorders, and determined that neither the "paragraph B" nor "paragraph C" criteria were met. [R. 13]. The ALJ determined the "paragraph B" criteria were not met because plaintiff did not have at least two of the following: marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation of an extended duration. The ALJ also found that plaintiff did not meet the "paragraph C" restrictions. [R. 13].

Before moving on to step four, the ALJ determined that plaintiff had the Residual Functional Capacity ("RFC") to perform a full range of work at all exertional levels except she should avoid hazards such as heights and open machinery. She is able to perform simple repetitive tasks and have only incidental contact with the public.[5] [R. 14].

At step four, the ALJ noted that plaintiff has no past relevant work. [R.18]. Finally, at step five of the sequential process, the ALJ considered the plaintiff's age, education, work experience, and RFC and found there are jobs that exist in significant numbers in the national economy. See 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), 416.966. [R. 19]. The ALJ based this determination on testimony given by the vocational expert ("VE"). The VE testified that there were a significant number of jobs available in the national economy for an individual with the plaintiff's age, work experience, education, and RFC such as a bench assembler or

---

[5] Incidental contact, for example, means contact that is more than the contact a hotel maid would have with guests. [R. 762].

housekeeper. [R. 19]. Thus, the ALJ concluded that plaintiff was not disabled under the Act from January 1, 1989, through the date of the decision.

## Issues

The plaintiff argues that the ALJ erred in three ways:

(1) He failed to perform a proper analysis of the treating physician's opinion of plaintiff's abilities to perform in the workplace. [Dkt. # 16 at 2].

(2) He failed to perform a proper credibility determination. Id.

(3) He failed to perform a proper determination at step 5 of the sequential evaluation process. Id.

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Act is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. "Evidence is unsubstantial if it is overwhelmingly contradicted by other evidence." O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994). The Court is to consider whether the ALJ followed the "specific rules of law that must be followed in weighing particular types of evidence in disability cases," but the court will not reweigh the evidence or substitute its judgment for that of the ALJ. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## Discussion

**The ALJ's Analysis and Discussion of the Treating Physician**

Plaintiff argues the ALJ failed to perform a proper analysis of the treating physician's opinion of plaintiff's abilities to perform in the workplace. [Dkt. # 16 at 2]. Plaintiff asserts that the ALJ failed to identify the weight he accorded to the treating physician and how he derived that weight. Id. Plaintiff also argues that the ALJ failed to cite contrary evidence that would justify his decision not to rely on the opinion of the treating physician. Id. at 3. Furthermore,

5

plaintiff asserts that the ALJ carefully and selectively chose statements in the record which were only favorable to his finding. Id. at 4. Plaintiff also claims the ALJ erred because he "barely mentioned" plaintiff's global assessment scores ("GAF"). Id. at 5. Finally, plaintiff argues that it was the job of the ALJ to contact the treating physician in order to define the term "moderate" so that the record would be fully developed. Id. at 5. The Court disagrees.

The ALJ is required to give a medical opinion of a treating physician's controlling weight if it is both: (1) "well-supported by medically acceptable clinical laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003), 20 C.F.R. § 1527(d)(2).

The ALJ found that the treating physician's opinion "cannot be given controlling weight because it is in conflict with [her] own treatment records and inconsistent with the other substantial evidence as noted." [R. 17]. Plaintiff argues the ALJ selectively chose evidence in the record to rely upon when determining whether the treating physician's opinion should be given controlling weight and that he did not specifically reference the "vague 'other evidence'" he was referring to in making his decision. [Dkt. # 16 at 4]. The undersigned finds that the ALJ thoroughly discussed the record from 1999 to 2007 in determining there was substantial evidence in the record that indicated a different opinion from that of the treating physician, Dr. Schechter. The ALJ began by examining the plaintiff's first treatment in the GLMHC:

> Psychological evaluation on January 19, 1999, revealed the claimant was oriented and had good insight into her mental problems. On February 2, 1999, the claimant reported that she felt better than ever and was getting along fine. The claimant's affect was well within the norms on June 8, 1999. Psychological evaluation on June 17, 1999, revealed regression as the claimant's depression had come back. On September 29, 1999, the claimant stated most of her depressive symptoms were gone. Her counselor noted she was doing exceptionally well. The claimant reported insomnia on November 9, 1999. The counselor noted the claimant appeared to use insomnia to mask the real problems; facing up to reality, being a single mother, and going to work. The claimant was discharged from

> Grand Lake on March 31, 2000 with a diagnosis of depressive disorder, borderline personality disorder, and her global assessment of functioning ("GAF") score was estimated at 50, indicating serious symptoms.

(citations omitted). [R. 15]. The ALJ also analyzed plaintiff's treatment records from GLMHC after she returned for additional treatment, noting that she failed to make the majority of her appointments.[6] The ALJ then assessed plaintiff's third return to GLMHC and treatment from Dr. Connor, a neurologist:

> On February 25, 2003… [t]he evaluation revealed the claimant was oriented and her thought was clear, logical, and linear. Her concentration, attention, and social judgment were fair while her insight appeared to be poor. The treatment appeared essentially routine and conservative in nature. On June 4, 2003, the claimant was doing well mentally and reported no side effects from her medications. The claimant reported on July 30, 2003, that she stopped certain medications on her own due to weight gain. The claimant reported 'everything is going great' on August 20, 2003. On August 27, 2003, the claimant reported everything was going well and she was working. The claimant was discharged on September 24, 2003, due to missing appointments and not contacting the clinic to reschedule. Dr. Connor reported on October 27, 2003, that the claimant's bipolar disorder has been relatively stable over the last four years which allowed the claimant to work at her job.
>
> As for the claimant's seizures, she reported her seizures started in July 2001. On February 25, 2003, the claimant reported she had been seizure free for over a year. Physical examination on October 27, 2003, was unremarkable. The claimant reported that her seizures were never really controlled by her medications so Dr. Connor adjusted her medications. An EEG, dated November 17, 2003, showed no focal or epileptiform features in the study.[7] MRI of the brain, dated December 17, 2003, was normal.[8] Physical examination on February 10, 2004, revealed claimant was doing much better with the medication adjustments. She only experienced one seizure and that was after she had run out of medicine for four days. On July 13, 2004, the claimant sounded like she was in a manic mode and Dr. Connor discussed the need to adjust her medications. Dr. Connor noted the claimant had not experienced any more seizures.

---

[6] The record indicates that plaintiff missed 10 appointments and appeared at only 5.

[7] EEG stands for electroencephalogram. This is a test that measures the brains electrical activity in order to better assess certain conditions such as seizures. See www.webmd.com.

[8] MRI stands for magnetic resonance imaging. This is a diagnostic tool that may be used to identify structural abnormalities in the brain associated with the cause of seizures. See www.epilepsy.com.

7

> Dr. Connor reported on November 17, 2005, that the claimant exhibited more mood instability. As far as her seizures were concerned, she was doing great on her medication. The claimant reported on February 14, 2006, that she felt normal for the first time. Examination on May 4, 2006, revealed the claimant was overall doing better. Dr. Connor turned over the psychiatric drug management to Dr. Schechter.

(citations omitted). [R. 16]. The ALJ next discussed the evaluation from Dr. Gordon, the consultative psychological examiner:

> The claimant underwent a consultative psychological evaluation on August 14, 2006. She was alert and attentive. Affectively her mood was one of depression. Dr. Gordon reported that the claimant's manner and attitude were appropriate while he estimated her level of intelligence at "average." The claimant's social-adaptive behavior was within normal limits. Dr. Gordon noted the claimant was oriented and her memory was adequate. Dr. Gordon assessed the claimant with bipolar disorder and her global assessment of functioning score was estimated at 70, indicating mild symptoms. Dr. Gordon reported the claimant's bipolar disorder was effectively treated and essentially in remission even though the claimant continued to sleep excessively.

(citations omitted). [R. 16]. Finally, the ALJ took into account Dr. Schechter's own records:

> The record indicated the claimant was doing better on December 19, 2006. Dr. Schechter had adjusted the claimant's medications. Dr. Schechter reported the claimant was doing fairly well on February 26, 2007, doing "great" on March 29, 2007, and doing well on May 3, 2007. On June 19, 2007, Dr. Schechter reported that the claimant was not taking her medication consistently. The claimant reported problems coping due to difficulties with her children.

(citations omitted). [R. 17].

Based on the foregoing, the undersigned finds that there is nothing vague about the "other evidence" to which the ALJ referred in making his finding. Also, there is ample evidence on record, which the ALJ discussed, to support the ALJ's finding that the treating physician's opinion was not due "much weight" because it was in conflict with her own treating records and in conflict with other substantial evidence which the ALJ examined.

Plaintiff further contends that the ALJ erred in his opinion because he did not properly determine what weight the opinion of the treating physician should be given. The Court

8

disagrees. To determine what weight a medical opinion is given, the following factors found in 20 C.F.R. § 404.1527 must be discussed:

> (1)The length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)).

First, as to the length of the treating relationship and the frequency of examination, the ALJ discussed a multitude of treatments the patient received from 2003 through 2008 from her treating physicians. [R. 16-17]. Second, the ALJ assessed the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed. Specifically, the ALJ noted that the plaintiff's treatment from 1999 to 2008 was mainly through her progress notes, but there were a few medical tests and medical opinions from other doctors that were examined. [R. 15-17].

Third, as to the degree to which the physician's opinion is supported by relevant evidence, the ALJ determined from the record that the treating physician's opinion was not supported, because the progress notes that were filled out by the treating physician conflicted with the assessment of the same physician regarding plaintiff's abilities. Also, the ALJ determined the treating physician's opinions were inconsistent with plaintiff's reported intensity, persistence, and limiting effects of the symptoms:

> The claimant testified her medications make her sleepy but she is on one medicine to keep her from sleeping all day. She stated that, on a daily basis, she gets her

9

> kids off to school. Sometimes her friend helps her with her children when she is depressed. She stated that she performs chores around the house. The claimant testified that she reads mysteries and romance novels and watches television sometimes.[9]

[R. 15].

Fourth, as to the consistency between the opinion and the record as a whole, the ALJ reviewed the treating physician's notes and compared the notes to plaintiff's mental RFC. He found that since the treating physician failed to complete the form and that the physician's notes, as well as much of the record, contradicted the findings in the mental RFC, the opinion of the treating physician could not be given controlling weight. [R. 17]. Also, Dr. Gordon, a consultative psychologist, examined plaintiff and found that her "bi-polar disorder was effectively treated and essentially in remission." [R. 16].

The ALJ does not discuss whether or not the treating physician was a specialist. However, in Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007), the court stated, "[claimant] cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." The fact that the ALJ failed to discuss whether the treating physician was a specialist does not create grounds for remand.

Finally, the ALJ must assess any other factors brought to his attention which will either support or contradict the treating physician's opinion. Here, the ALJ notes that the treating physician did not completely fill out the form. [R. 17]. Therefore, the findings that Dr. Schechter made with regard to plaintiff's moderate limitations cannot be justified, because the

---

[9] The undersigned notes that the ALJ misstated that the plaintiff reads mysteries and romance novels. The plaintiff testified that she used to enjoy reading. [R. 760]. This error is of little significance and does not constitute an error that is grounds for remand.

narrative portion is not completed. [R. 17]. Moreover, the ALJ articulated "good reason" for not assigning controlling weight to the treating physician:

> While the undersigned has carefully considered Dr. Schechter's opinion, it cannot be given controlling weight because it is in conflict with Dr. Schechter's own treatment records and inconsistent with the other substantial evidence as noted above.
>
> Dr. Schechter did report that the claimant was not significantly limited in her ability to remember work-like procedures or locations. She would be able to understand, remember, and carry out simple instructions. The claimant could make simple work-related decisions and sustain an ordinary routine without special supervision. She is able to interact with the general public and ask simple questions or request assistance. These abilities are consistent with the residual functional capacity given by the undersigned.
>
> The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of 'not disabled.' Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout the decision)…
>
> The Administrative Law Judge does not discount all of the claimant's complaints. In view of her bipolar disorder and seizures, she would undoubtedly have some difficulties. However, the claimant's treating physicians did not place any functional restrictions on her activities that would preclude work activity with the previously mentioned restrictions. The claimant's daily activities appear restricted, but these restrictions are self imposed. There is no evidence that any of the claimant's treating physicians have told her to do nothing all day. Given the objective medical evidence in the record, the Administrative Law Judge finds that the claimant's residual functional capacity is reasonable, and that the claimant could function within those limitations without experiencing significant exacerbation of her symptoms.

(citations to pages omitted). [R. 17].

The ALJ determined that because the opinions made by the treating physician were not well-supported by clinical evidence and there was substantial evidence which contradicted the findings of the treating physician, controlling weight could not be given. The undersigned finds that the ALJ's analysis was proper.

Plaintiff also asserts that the ALJ improperly rejected the opinion of the treating physician because he did not demonstrate contrary evidence. [Dkt. # 16 at 3]. As noted above, the ALJ conducted a thorough evaluation of the evidence before him in making his decision regarding the weight of the treating physician's opinion. The ALJ referenced the findings of the state agency examiners, as well as the opinion of the consultative examiner. [R. 16-17]. Thus, the undersigned finds no merit to this argument.

Next, plaintiff argues that the ALJ failed because he did not properly consider plaintiff's GAF scores. In Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002), the court held, "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." Here the ALJ did take into account two of the plaintiff's GAF scores in making his determination. In addition, since GAF scores are not an essential part of the ALJ's determination, the undersigned rejects plaintiff's argument, finding that it has no merit.

Moreover, the ALJ is not required to discuss every piece of evidence. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss the evidence which supports his decision, and in addition he "must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects." Id. "But [the treating physician's] GAF evaluation was not uncontroverted; and the ALJ, for the reasons given for his not accepting [the treating physician's] diagnosis, did not need to find her GAF scoring to be significantly probative." Crane v. Astrue, 2010 WL 939853 (10th Cir. 2010). Thus it was not error for the ALJ to "barely mention" plaintiff's GAF scores.

12

Finally, plaintiff argues the ALJ ignored his duty to fully develop the record. [Dkt. # 16 at 4]. The undersigned finds no indication in this case that the record was not fully developed. The ALJ took the necessary steps to assure the record was properly developed for his review. At the start of the hearing the ALJ inquired of plaintiff's counsel as to whether the record was fully developed and complete. [R. 749]. Plaintiff's counsel responded, "Yes, Your Honor." [R. 749]. The ALJ then inquired as to whether there was any objection to the records, and the plaintiff's counsel responded "No." [R. 749]. The ALJ gave plaintiff's counsel an opportunity to make an opening statement, to conduct direct examination, to question the vocational expert, and to make a closing statement. At both the beginning and the close of the hearing, the ALJ even asked plaintiff's counsel to contact the treating doctor in order to clarify a piece of the medical evidence. [R. 750, 765]. Plaintiff's counsel failed to do so. Thus, the undersigned finds that the record was sufficient for the ALJ to determine the weight to be given to Dr. Schechter's opinion.

Furthermore, the undersigned finds that, other than the management of plaintiff's prescriptions, Dr. Schechter did not provide any treatment, examination, or objective medical testing as a foundation for her opinion. The boxes checked by Dr. Schechter are merely her conclusory opinion regarding plaintiff's subjective complaints. The form which Dr. Schechter failed to complete contains a narrative section at the end. Since this section was not completed, the doctor's opinion is clearly conclusory in that she provided no evidence or reasoning as to why she checked the boxes she did. The Tenth Circuit has held that a treating physician's opinion must be given substantial weight "unless good cause is shown to the contrary." Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988) (citing Frey v. Bowen, 816 F.2d at 513). "[A] treating physician's report may be rejected if it is brief, conclusory, and unsupported by medical evidence." Id. In this case, the undersigned finds the opinion of Dr. Schechter brief, conclusory,

and unsupported by medical evidence. In fact, the medical evidence from another treating physician (the EEG and MRI from Dr. Connor) indicates that plaintiff has no abnormalities. Therefore, the opinion of Dr. Schechter was properly rejected by the ALJ.

**Credibility**

Plaintiff argues that the ALJ failed to conduct a proper credibility determination. [Dkt. # 16 at 5]. The exaggeration of symptoms in order to obtain government benefits is not to be taken lightly, therefore an ALJ's credibility determinations are generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990). In reviewing the ALJ's credibility determinations, the court will usually "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of Health & Human Serv., 933 F.2d 799, 801 (10th Cir. 1991). See also Diaz v. Sec'y of Health & Human Serv., 898 F.2d 774, 777 (10th Cir. 1990) ("Credibility determinations are peculiarly the province of the finder of fact."). In determining if the ALJ made a proper credibility finding, he must not have simply listed and recited the factors that are set forth in Social Security Ruling 96-7p, 1996 WL 374186. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d at 1133 (footnote omitted).

Here, the ALJ set forth a summary of plaintiff's testimony as follows:

The claimant testified, under oath, that she would be able to work if it was not for her mental problems. She stated that she does not drive far due to seizures, even though they are under control. The claimant testified that she was fine physically except for her seizures. She stated that she has small seizures, once every six months. Dr. Connor got them under control in 2005. The claimant testified that her bi-polar disorder is the main reason she is unable to work. She stated that her "phases" last 4-6 weeks at a time. The claimant testified her medications make her sleepy but she is on one medicine to keep her from sleeping all day. She stated that, on a daily basis, she gets her kids off to school. Sometimes a friend helps her with her children when she is depressed. She stated that she performs

>   chores around the house. The claimant testified that she reads mysteries and romance novels and watches television sometimes.[10]

[R. 15]. The ALJ then linked his credibility determination to his discussion of the evidence, stating:

>   After considering the evidence of record, the undersigned finds that the claimant's medially determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

[R. 15].

As discussed above, the ALJ examined the doctor's notes from 1999-2007, along with plaintiff's past work and her daily activities, neither of which he concluded supported her claim. [R. 15-18]. Also, the ALJ cited medical tests, performed by Dr. Connor, which revealed no abnormalities. [R. 16]. In examining these records, the ALJ correctly found that the conditions plaintiff had were not medically shown to prevent plaintiff from doing simple repetitive tasks. The ALJ determined that given the objective medical evidence of record, plaintiff's RFC was reasonable. [R.18]. The ALJ determined that since plaintiff has earnings posted for every year from 1989 to 2003, plaintiff's "daily activities have, at least at times, been greater than what claimant had generally reported." [R. 18]. Since the ALJ linked his credibility finding with substantial evidence, the undersigned finds no error.

Plaintiff also contends that the ALJ improperly, and selectively, discussed those records which showed plaintiff to be doing better on medications and that the ALJ only noted one deterioration. [Dkt. # 16 at 7]. However, the ALJ, in his opinion, found in plaintiff's progress notes that there was "revealed regression as [plaintiff's] depression had come back." [R. 15].

---

[10] See n.9 supra.

The ALJ also made note of her GAF score from March 31, 2000, which was estimated at 50, indicating serious symptoms. [R. 15]. The ALJ also reported that Dr. Connor talked to plaintiff when she appeared to be in a manic mode. [R. 16]. The ALJ spoke of Dr. Connor's note from November 17, 2005, when plaintiff was exhibiting more mood instability. [R. 16]. Since the ALJ examined the record as a whole in making his credibility finding, the undersigned finds that the ALJ did not err in finding the plaintiff not credible.

Plaintiff contends that the ALJ ignored plaintiff's medication changes and the side effects of those medications. While this assertion has some merit, the ALJ heard the testimony of plaintiff, in which she told him the medications made her tired but that she was taking medication which prevented her from sleeping all day. [R. 759]. Also, the ALJ considered a note in which Dr. Connor notes that plaintiff needed an adjustment to her medications. [R. 15-16]. The ALJ considered a progress note from Dr. Schechter, in which Dr. Schechter noted that plaintiff was not taking her medications on a regular basis. [R. 17]. Given the ALJ's assessment of the medical evidence and plaintiff's testimony, the ALJ found that plaintiff was responding well to her medications and generally had problems only when she failed to take them. [R. 18].

The ALJ is not required to make a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Since the ALJ set forth the specific evidence he relied upon, applied the correct legal standards in evaluating the plaintiff's subjective allegations of pain, and his determination on this matter is supported by substantial evidence in the record, the undersigned finds the ALJ did not commit any error in evaluating the plaintiff's credibility.

**The ALJ's evaluation at Step 5**

Plaintiff argues that the ALJ failed to conduct a proper determination at step 5 of the sequential analysis. [Dkt. # 16 at 10]. Specifically, plaintiff asserts that the ALJ's hypothetical and RFC do not include all of the limitations of record including those imposed by the treating physician. The Court disagrees.

Step 5 of the sequential analysis asks whether or not the plaintiff can perform other work existing in the national economy. In an effort to determine whether such work exists, the ALJ posed a hypothetical to the VE asking whether there are significant numbers of jobs in the national economy that can be performed by someone having the same limitations as plaintiff. In posing a hypothetical question, an ALJ only needs to set forth the physical and mental impairments which he has accepted as true. See Talley v. Sullivan, 908 F.2d 585, 588 (10th Cir. 1990). The hypothetical the ALJ posed to the VE was:

> ALJ: We have an individual with the same age, education, vocational history as this claimant who is limited, the individual would need to avoid hazards such as heights and open machinery; and would be limited to simple, repetitive tasks; and incidental contact with the public. Incidental contact with the public would mean, for example, the kind of contact that a maid who would clean hotel rooms might have when they bump into people staying in the rooms, but not have to deal with them on a regular basis. Are there any jobs in significant numbers in the regional or national economy?
>
> VE: Yes…bench assembler. Regionally…40,000. Nationally there are 600,000. This is unskilled SVP 2. Exertional level is light. There's also the job of a housekeeper. Regionally there are 11,000 and nationally there are 180,000. This is unskilled, the SVP is 2, the exertional level is light.

[R. 762]. As set forth above, the ALJ's analysis of the treating physician's opinion was not in error. Moreover, the RFC formulated by the ALJ takes into consideration those limitations which the ALJ found were supported by the record and, with respect to which, the Court finds not error. Further, the hypothetical posed to the VE is consistent with the RFC. Thus, the ALJ

17

did not err in determining that there were jobs in the regional and national economy that plaintiff could perform.

Plaintiff's argument that the ALJ improperly ignored the VE's testimony, to the extent that the testimony was based on limitations imposed by her treating physician, is without merit. The ALJ does not have to accept testimony from the VE that is not based on limitations that are established in the record. See Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993). Specifically, plaintiff elicited advantageous testimony from the VE by requiring the VE to assume the unestablished, conclusive fact that the treating physician's definition of "moderate" was the same as the VE's. There was nothing in the record to support this assumption. Thus, the ALJ was not bound to accept any opinion of the VE that was based on this assumption. Therefore, the ALJ's analysis at step 5 of the sequential process is without error.

## Conclusion

For the above stated reasons, the Court finds that the ALJ's decision not to give the treating physician controlling weight was proper because there was substantial evidence that contradicted her opinion, including her own treatment notes. The Court also finds the ALJ's credibility determination is closely and affirmatively supported by substantial evidence in the record. The Court further finds that the ALJ did a proper evaluation at step five of the sequential process. Accordingly, the decision of the Commissioner finding the plaintiff not disabled is hereby AFFIRMED.

SO ORDERED this 11th day of June, 2010.

T. Lane Wilson
United States Magistrate Judge